Filed 8/26/16  Nazareth v. Malcolm & Cisneros CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TERESA NAZARETH,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MALCOLM & CISNEROS,<br><br>    Defendant and Respondent. | A143229<br><br>(Alameda County<br>Super. Ct. No. RG13674746) |

This lawsuit was premised on plaintiff Teresa Nazareth's claim that her attorneys Malcolm & Cisneros (M&C) disclosed to Federal Home Loan Mortgage Corporation (Freddie Mac) confidential information they acquired while briefly representing both Nazareth and Freddie Mac in a wrongful eviction action.  Asserting M&C's alleged disclosures resulted in her loss of a valuable business relationship with Freddie Mac, after the underlying action settled Nazareth sued M&C for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty.  The court granted M&C's motion for summary judgment, and Nazareth appeals.  The court correctly ruled that Nazareth failed to demonstrate a triable issue of material fact as to any of her causes of action, so we affirm.

## BACKGROUND

### *The Underlying Litigation*

Between 2007 and 2012 Nazareth, a real estate broker, contracted with Freddie Mac to sell foreclosed homes in Contra Costa and Alameda Counties.  In June 2009, Freddie Mac assigned Nazareth a house on Harvey Avenue in Oakland to manage and list

1

for sale.  The house was occupied by tenants Zach Clemons and Wesley Payne. Nazareth had the Harvey Avenue property re-keyed and the contents "trashed-out," or disposed of as garbage.  In August 2011 she  informed Freddie Mac that the "trashout" was complete.

Clemons and Payne filed the underlying suit against Nazareth, Freddie Mac and others in September 2011.  Anthony Haynes and Melissa Sgroi of M&C were  assigned to defend Freddie Mac.  Nazareth initially retained attorney Nathan Borris, but on December 29, 2011, Sgroi advised her that Freddie Mac would allow M&C to represent her "until Freddie Mac has an opportunity to complete a review of this asset."

On January 4, 2012, Borris advised Nazareth of conflicts that could arise from M&C's joint representation.  He wrote, "It would appear that your defenses would be the same as Freddie Mac's, but each of you had distinct tasks and duties in the eviction and sale of the property.  Depending on the facts established at trial, the judge or jury may find that you were liable and Freddie Mac was not, or the other way around.  If such a discrepancy exists, it makes it difficult for the attorney representing two co-defendants to litigate, as establishing one fact may be beneficial to one defendant but injurious to the other.  [¶] Also, in the event all defendants are found liable, the judge may offset damages to each defendant depending on culpability.  If an attorney representing two co-defendants finds them to be in such a position where one may owe more than the other, it can be tough to thoroughly defend the interests of both parties.  [¶] Finally, considering that you were acting as an agent of Freddie Mac, in the event you are found liable, you could likely seek indemnification from Freddie Mac, i.e., allege that they are obligated to pay your share of the judgment, based on a principal-agent theory.  Though this may be of benefit to you, it is prejudicial to the indemnified party, ie, Freddie Mac."   Nazareth signed Borris's letter, acknowledging she had read and understood his advisements.

In a January 24, 2012 letter to Nazareth, Sgroi confirmed that M&C was authorized to represent Nazareth but warned that she would need to retain separate counsel in the event the ongoing investigation disclosed grounds for a conflict of interest.

M&C substituted as counsel of record on January 27 and jointly represented Nazareth and Freddie Mac through April 2, 2012.

On March 8 Sgroi sent Freddie Mac a written analysis of the lawsuit filed by Clemons and Payne. Sgroi reported that the records Nazareth had provided contained no proof she had inspected the property during the relevant period and Sgroi advised that "Because Freddie Mac can be held liable for the acts of its agents, a third-party complaint against Chase and/or Teresa Nazareth may be appropriate given their actual/inquiry notice of the habitability defects." Moreover, Sgroi wrote, "we are informed and believe that Ms. Nazareth secured the Property after determining that the Property had been 'abandoned.' If Freddie Mac failed to follow procedural requirements for establishing abandonment, Freddie Mac may be held liable for these claims."

On March 13 Sgroi informed Nazareth that M&C was no longer able to represent her. Referencing her January 24 letter, she explained that a potential conflict had come to light that would require Nazareth to retain separate counsel. On March 27 Sgroi informed Borris of the conflict and told him M&C would continue to represent Freddie Mac. Borris told her Nazareth had no objections to M&C's continued representation of Freddie Mac and, with Nazareth's agreement, substituted in as her counsel.

On September 10, 2012, the parties and their counsel participated in a mediation. Freddie Mac senior eviction specialist Blanca Oliver also attended. A settlement was reached.

*Freddie Mac Removes Nazareth From Its Broker Network*

On November 3, 2012, Freddie Mac notified Nazareth that her company "would be presented to Freddie Mac's Disciplinary Committee Thursday 11/8/2012. We are in receipt of our Designated Counsel's mediation summary from the meeting that occurred on September 10, 2012 and your conduct and unprofessionalism during the meeting violates our Code of Conduct. [¶] The mediation was for asset #660858 and your failure to post a personal property notice after being instructed to do so by Freddie Mac. During the mediation you consistently stated that Freddie Mac is 'rich' and 'has millions of dollars' and if anyone should be responsible it would be Freddie Mac. You also stated at

3

various times something to the effect of 'Freddie Mac was bailed out by the government and tax payers are paying all of your bills. You are costing the tax payers millions of dollars.' Your comments made it difficult to negotiate and you had to be threatened with further legal action before finally agreeing to pay a specified amount of money. Your comments, unprofessionalism and lack of respect towards Freddie Mac make it appear you are not satisfied with your Client."

Nazareth responded with a written explanation of her actions. Among other things, she stated that the occupants of the Harvey Avenue house had been using it as a grow house, that her company verified that it was unoccupied, and that "the debris which left behind was not worth $300 and was a health hazard." Moreover, "We have been instructed by eviction reps for Freddie Mac for a significant period of time that any property that has been vacated and has belongings worth less than $300 should be trashed out without PPN. We are attaching emails from 2010 showing this instruction was given to us. . . . The eviction attorney instructed us to re-key and to post only if there were belongings. . . . The pictures show there was only trash and debris and assorted drug growing debris. There were no belongings."[1]

On November 15, Freddie Mac terminated its business relationship with Nazareth. After Nazareth wrote seeking a further explanation for her termination, Freddie Mac responded, in part, that "By not following the Personal Property Eviction post/notice California statute you violated the " 'Compliance with Laws' " section [of Freddie Mac's Code of Conduct]. Then your conduct in the mediation summary violated the overall conduct required by Freddie Mac brokers/agents/vendors."

Nazareth wrote to appeal the committee's decision. She wrote, "the accusations brought against me referred to paraphrased statements which are not my beliefs nor are they views I have ever endorsed. I apologize for any misinterpretation that occurred, and I categorically deny that these are my opinions. I view Freddie Mac as an organization

---

[1] It was undisputed that a "PPN" is a notice required by law to be posted to advise occupants that any property valued at less than $300 left after the premises are vacated or abandoned may be kept, sold or destroyed after a specified period of time.

that is involved with and cares about the local communities, with the noble goal of promoting home ownership and the well being of the communities it works in." She also reiterated that her company used all appropriate methods to verify the property was unoccupied and "followed the procedures for posting of the notice, as had been given to us in writing for situations involving personal property valued under $300."

Freddie Mac did not change its decision to terminate its relationship with Nazareth.

*Nazareth Sues M&C*

Nazareth sued M&C for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. As relevant here, her complaint alleged M&C acquired confidential and sensitive information while representing her in the underlying action and divulged it to Freddie Mac, which relied on it to terminate its contract with her. According to the complaint, M&C attorneys told Freddie Mac that Nazareth's conduct was unprofessional, illegal, violated Freddie Mac's code of conduct, made it difficult to negotiate with the plaintiffs in the underlying suit, and was disrespectful to Freddie Mac. More specifically, the complaint alleged that M&C falsely told Freddie Mac that Nazareth failed to post a PPN at the Harvey Avenue property and "at material times including before November 15, 2012" made disparaging statements about Freddie Mac such as "FREDDIE MAC is rich," FREDDIE MAC has millions of dollars," and "Freddie Mac is costing the taxpayers millions of dollars." "As a proximate result of the acts, conduct and breaches alleged herein, FREDDIE MAC terminated its business relationship with plaintiff, failed to give plaintiff any new listings for the sale and management of properties, and informed plaintiff that FREDDIE MAC no longer feels that plaintiff meets its business expectations in supporting its goal, all actions that are detrimental to plaintiff's business relationship with FREDDIE MAC and proximately caused plaintiff to suffer damages."

M&C moved for summary judgment on the ground that Nazareth could not demonstrate the existence of a triable issue of material fact as to duty or causation with respect to any of her causes of action. The trial court agreed. The key passages of its

5

thoughtful and detailed analysis explain: "Plaintiff offers no evidence or argument to dispute the fact that Freddie Mac terminated Plaintiff . . . based on (1) derogatory statements about Freddie Mac made at the mediation and Plaintiff's conduct at the mediation generally, and (2) Plaintiff's failure to post a PPN at the property. [¶] M&C has provided evidence that its decision to terminate its contractual relationship with Plaintiff was not caused by statements made to Freddie Mac by M&C. The declaration of Blanca Oliver, a REO Senior Litigation Specialist . . . , states that she attended the mediation on September 10, 2012. She asserts that M&C did not inform Freddie Mac that (1) Plaintiff made derogatory statements about Freddie Mac, or (2) Plaintiff failed to post a PPN with regard to the property. Ms. Oliver states that Plaintiff made those statements in Oliver's presence. *Although Plaintiff's objections to evidence about statements made at the mediation are sustained, the declaration of Blanca Oliver is still admissible to show that M&C did not make the statements to Freddie Mac that are alleged by Plaintiff.*" The court further found that Nazareth offered no evidence to support her claim that M&C conveyed her alleged derogatory statements to Freddie Mac.

The court's ruling also referred to Nazareth's deposition testimony that she did not recall being asked by or informing M&C whether she failed to post a PPN at the property. "Nevertheless, Plaintiff now asserts in her declaration, with no explanation or foundation, that she informed [Sgroi] at some unspecified point and in some unspecified manner during the representation period that her office did not post a PPN at the property. Plaintiff also asserts that she was following Freddie Mac guidelines in not doing so. Plaintiff cannot avoid summary judgment by contradicting her deposition testimony without some explanation. D'Amico v. Board of Med. Examiners (1974) 11 Cal.3d 1, 21. Plaintiff has not provided any explanation for her new recollection, and the conclusory nature of her testimony indicates the policy underlying the holding in D'Amico is fully applicable in this case. However, Plaintiff's declaration is admissible to show that she did not post a PPN at the property, and that she does not believe she acted improperly in failing to do so."

6

The court specifically found that Nazareth failed to show the existence of triable issue with respect to causation. "Plaintiff's contention that M&C disclosed her failure to post a PPN, and that this was a substantial factor in Freddie Mac's decision to terminate her employment, is too speculative to create a reasonable inference. Plaintiff suggests that M&C must have disclosed this fact to Freddie Mac, but she offers no evidence about when or how this might have occurred. Plaintiff also fails to explain why Freddie Mac would not have discovered that Plaintiff failed to post a PPN, if not for the conduct of M&C. Moreover, Freddie Mac explicitly based its decision on Plaintiff's conduct during the mediation. Freddie Mac could properly rely on statements and conduct at the mediation to determine that its contractual relationship with Plaintiff should be terminated."

The court further explained: "Plaintiff objects to introduction of evidence about statements made at the mediation based on Evidence Code sec. 1119. However, those objections, if sustained, effectively prevent Plaintiff or M&C from showing that she did not disclose to M&C at the mediation that she failed to post a PPN or that she did not make the other statements claimed by Freddie Mac at the mediation. Freddie Mac denies that M&C told it that Plaintiff did not post a PPN, and Plaintiff has no evidence other than speculation to dispute that fact. Plaintiff does not dispute that she told Freddie Mac she failed to post a PPN at the property. Plaintiff also fails to show that Freddie Mac should not have discovered that she failed to post a PPN at the property even if she had been represented by independent counsel. The evidence with regard to causation in this case presents only a dwindling stream of probabilities that narrows into conjecture."

Nazareth filed this timely appeal from the ensuing judgment in favor of M&C.

## DISCUSSION

### I. Legal Standards

" 'To secure summary judgment, a moving defendant may prove an affirmative defense, disprove at least one essential element of the plaintiff's cause of action [citations] or show that an element of the cause of action cannot be established [citations]. [Citation.] The defendant "must show that under no possible hypothesis

7

within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial." [Citation.] [¶] 'The moving defendant bears the burden of proving the absence of any triable issue of material fact, even though the burden of proof as to a particular issue may be on the plaintiff at trial. [Citation.] . . . Once the moving party has met its burden, the opposing party bears the burden of presenting evidence that there is any triable issue of fact as to any essential element of a cause of action.' [Citation.]" (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1485.)

"In reviewing the propriety of a summary judgment, the appellate court must resolve all doubts in favor of the party opposing the judgment. [Citation.] The reviewing court conducts a de novo examination to see whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law. [Citation.]" (*M.B. v. City of San Diego* (1991) 233 Cal.App.3d 699, 703–704.) "We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. [Citation.] However, to defeat the motion for summary judgment, the plaintiff must show ' "specific facts," ' and cannot rely upon the allegations of the pleadings. [Citations.]" (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805.) "While '[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be granted only if there is no issue of triable fact' [citation], it is also true '[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one.' [Citation.] 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]' [Citation.]" (*M.B. v. City of San Diego, supra,* at p. 704.)

### II. *Nazareth Failed To Show The Existence of a Triable Issue as to Causation*

M&C argues, as the trial court found, that Nazareth cannot establish a triable issue of fact as to causation. We agree.

"Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain." (*Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233; Civ. Code, §§ 3300, 3301.) "To establish the element of actual causation, it must be shown that the defendant's act or omission was a substantial factor in bringing about the injury. [Citation.] Under the current version of the summary judgment statute, a moving defendant need not support his motion with affirmative evidence negating an essential element of the plaintiff's case; instead, the defendant may point to the absence of evidence of support the plaintiff's case. [Citation.] Thus, if the defendant has shown, through the evidence adduced in the case, that the plaintiff cannot reasonably expect to establish a prima facie case of causation, and that a nonsuit in the defendant's favor would be inevitable, then 'the trial court was well justified in awarding summary judgment to avoid a useless trial.' " (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 752, 768 (*Padilla*); see also *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1240–1241; *Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 14–15 (*Wiz*).) "Summary judgment will be upheld where the plaintiff's evidence is little more than guesswork ' "in the realm of mere speculation and conjecture." ' " (*Wiz, supra,* 106 Cal.App.4th at p. 15.)

Nazareth theorizes that M&C caused the termination of her relationship with Freddie Mac by intimating in Sgroi's March 8, 2012 memorandum that Nazareth failed to post a PPN on the Harold Avenue property.[2] She asserts Freddie Mac "became adverse to" her immediately upon receiving the March 8 report and terminated her contract for failing to post a PPN on November 15, eight months later. Nazareth contends that these

---

[2] She does not argue on appeal, as she did in the trial court, that M&C told Freddie Mac about disparaging comments she allegedly made at the mediation, and that this also contributed to Freddie Mac's decision to terminate her contract. While we therefore deem that theory abandoned, it would not help her. M&C no longer represented Nazareth by the time of the mediation and, accordingly, bore no contractual or fiduciary duty not to disclose her behavior and comments at the mediation to Freddie Mac.

9

events, supported by the period of joint representation and correspondence between M&C and Freddie Mac in March 2012 addressing the potential conflict of interest, present a triable issue as to causation. We disagree.

First, the March 8 memorandum did not say that Nazareth failed to post a PPN. In discussing the Clemons/Payne lawsuit, Sgroi wrote that Nazareth reported she changed the locks only after determining the property was abandoned. Sgroi counseled Freddie Mac that this was a valid defense against wrongful eviction, but she cautioned that "[p]roof of abandonment . . . requires satisfaction of specific requirements that may or may not have been satisfied. At this time, we are informed and believe that Ms. Nazareth secured the Property after determining that the Property had been 'abandoned.' If Freddie Mac failed to follow procedural requirements for establishing abandonment, Freddie Mac may be held liable for these claims." While Sgroi's memorandum thus raised a potentially significant issue in the underlying litigation—and a potential conflict between Nazareth and Freddie Mac—it neither conveyed that she failed to post a PPN or otherwise follow necessary procedures as a matter of fact  nor rebutted Oliver's declaration that M&C "did not inform Freddie Mac that plaintiff failed to post a personal property notice" at any time before Nazareth was terminated.[3]  Nazareth offered no other evidence showing that M&C ever disclosed her failure to post a PPN to Freddie Mac.

Nazareth's causation theory fails for another reason as well, as the trial court observed. Whether or not M&C informed Freddie Mac of her failure to post—of which,

---

[3] The court properly sustained Nazareth's objections to statements in Oliver's declaration that concerned communications made at the mediation (Evid. Code, § 1119) and overruled objections to other statements that did not.  Nazareth's objection to Oliver's statement that M&C did not tell Freddie Mac about disparaging comments Nazareth allegedly made during the mediation ("FREDDIE MAC is rich," "FREDDIE MAC is costing the taxpayers millions of dollars," etc.) is irrelevant.  Even if those alleged post-arbitration statements were subject to mediation confidentiality —to be clear, we reach no such conclusion—Nazareth has not asserted on this appeal that these alleged communications caused or contributed to the loss of her contract with Freddie Mac.  Accordingly, we do not reach her contention that the trial court erred in overruling her objection to their admission.

to be clear, she adduced no admissible evidence—Freddie Mac would inevitably have discovered that fact independently. It is undisputed that Nazareth did not post the notice, as the evidence plainly showed. Nazareth admitted as much in her declaration. She told Freddie Mac's disciplinary committee she had "been instructed by eviction reps for Freddie Mac for a significant period of time that any property that has been vacated and has belongings worth less [than] $300 should be trashed out without PPN. . . and "followed the procedures for posting of the notice, as had been given to us in writing for situations involving property valued under $300." Her deposition testimony and her declaration were consistent.[4]

Accordingly, it cannot reasonably be argued that Freddie Mac would not have discovered Nazareth's failure to post a PPN while litigating the Clemons/Payne suit if not for the alleged (but unsubstantiated) disclosure by M&C. "Where there is evidence that the harm could have occurred even in the absence of the defendant's negligence, 'proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence. . . .'" (*Padilla, supra*, 160 Cal.App.4th at p. 752.) Such is the case here. Nazareth failed to adduce any evidence demonstrating a triable issue as to her allegation that M&C's actions caused the loss of her relationship with Freddie Mac, so summary judgment was appropriate. In light of this conclusion, we need not address her arguments that there were triable fact issues as to the elements of duty and breach.

---

[4] After Nazareth testified she did not know whether her assistant posted a PPN at the property, she was asked: "Q: Do you recall whether or not that happened in this case with Mr. Clemons and Mr. Payne? [¶] A: I know Freddie Mac said trash-out after they saw the pictures and rekey. [¶] Q: How is the trash-out related to a PPN? Are you assuming because Freddie Mac told you to trash-out and rekey that there was no PPN posted? [¶] A: Probably, yes. If we – if it's under [$300]." Her assistant testified that he neither sent the plaintiffs any notice that their property would be discarded nor placed a notice in the newspaper.

11

## II. Evidentiary Objections

Nazareth argues the court erroneously admitted evidence subject to the mediation confidentiality provisions of Evidence Code sections 1199 and 1126. There was no prejudicial error.

### Legal Standards

"We review the trial court's evidentiary rulings on summary judgment for abuse of discretion. [Citations.] As the parties challenging the court's decision, it is plaintiffs' burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason. [Citation.] 'Where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the correct result for the decision of the trial court.' [Citation.] We will only interfere with the lower court's judgment if appellant can show that under the evidence offered, ' "no judge could reasonably have made the order that he did." ' [Citation.] Plaintiffs' showing will be 'insufficient if it presents a state of facts which simply affords an opportunity for a difference of opinion.' " (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679–680.)

The statutory purpose of the mediation confidentiality statutes is "to encourage the use of mediation by promoting ' " 'a candid and informal exchange regarding events in the past. . . . This frank exchange is achieved only if the participants know that what is said in the mediation will not be used to their detriment through later court proceedings and other adjudicatory processes.' [Citations.]" [Citation.]' [Citation.] [¶] Section 1119 governs the general admissibility of oral and written communications generated during the mediation process. Subdivision (a) provides in pertinent part that '[n]o evidence of anything said or any admission made *for the purpose of, in the course of, or pursuant to,* a mediation . . . is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any . . . civil action. . . .' (Italics added.) Subdivision (b) similarly bars discovery or admission in evidence of any 'writing . . . prepared for the purpose of, in the course of, or pursuant to, a mediation. . . ." Subdivision (c) of section 1119 further provides that '[a]ll communications, negotiations, or settlement discussions *by and*

*between* participants in the course of a mediation . . . shall remain confidential.' (Italics added.) Exceptions are made for oral or written settlement agreements reached in mediation if the statutory requirements for disclosure are met." (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 123–124; see also *Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 578–582.) Communications protected under the mediation confidentiality provisions "remain inadmissible, protected from disclosure, and confidential to the same extent after the mediation ends." (Evid. Code, § 1126.)

*Nazareth's Objections*

Here, some of the objections Nazareth now asserts were overruled in error were, in fact, sustained. Those objections that the court in fact overruled for the most part lacked merit because they did not disclose communications made "for the purpose of, in the course of, or pursuant to" the mediation. These include, for example, a statement in Oliver's declaration that simply identified the date, location and attendants at the mediation, correspondence between Nazareth and Freddie Mac some two months after the mediation concluded, and most of Nazareth's deposition testimony. In any event, "it is not sufficient that appellants merely show error, they must in addition show prejudice." (*Mize v. Atchison, T.& S.F. Railway Co.* (1975) 46 Cal.App.3d 436, 450; Evid. Code, § 353, subd. (b); Cal. Const. Art. VI, § 13.) To the minor extent the cited documents or testimony included passages that were arguably subject to mediation confidentiality, Nazareth has not even attempted to show how she was prejudiced by their admission. To the contrary, we are satisfied that they could not have made a difference in the outcome. M&C introduced properly admitted evidence to show its attorneys did not make the statements Nazareth alleged caused Freddie Mac to terminate her contract. Nazareth, in turn, failed to adduce admissible evidence that they did. Having reviewed the record with great care and assuming error solely for the purpose of argument, we are satisfied that such error, if any, was thus harmless.

**DISPOSITION**

The judgment is affirmed.

13

_____
Siggins, J.

We concur:


_____
McGuiness, P.J.


_____
Pollak, J.